# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 23-cv-60011-ALTMAN/Hunt

**NOEL A. BROWN**,

　　*Plaintiff*,

*v.*

**LEARJET, INC.**,

　　*Defendant.*

_____/

## <u>ORDER</u>

On September 5, 2022, our Plaintiff, Noel A. Brown, sued the Defendant, Learjet, Inc. ("Learjet"),[1] in the Circuit Court of the Seventeenth Judicial Circuit for Broward County, Florida. *See* Notice of Removal [ECF No. 1]. Brown alleged that Learjet violated Title VII of the Civil Rights Act of 1964 ("Title VII"), the Civil Rights Act of 1866 ("§ 1981"), and the Florida Civil Rights Act of 1992 ("FCRA"). On January 2, 2023, Learjet removed this action to federal court. On April 11, 2023, Brown filed an Amended Complaint (the "AC") [ECF No. 35].

On October 26, 2023, Learjet filed a Motion for Summary Judgment (the "MSJ") [ECF No. 57], asking us to grant summary judgment on all of Brown's claims. Brown's response was due on November 9, 2023. *See* S.D. FLA. L.R. 7.1(c)(1) ("For all motions . . . each party opposing a motion

---

[1] Brown originally named "Bombardier Aerospace INC." as the Defendant. *See* Notice of Removal [ECF No. 1]. But, in its corporate disclosure statement, Learjet observed:

> The entity that employed the Plaintiff, and therefore the proper party Defendant, was "Learjet Inc." There is no entity known as "Bombardier Aerospace Inc.," and Plaintiff was not employed by that non-existent entity.

Defendant's Corporate Disclosure Statement [ECF No. 3] at 1. Brown then properly named Learjet as the Defendant in his Amended Complaint [ECF No. 35]. *See* Clerk's Notice of Docket Correction [ECF No. 42] ("Defendant's Name was changed in amended complaint de 35"). So, to the extent that any filings mention "Bombardier," we'll construe those as references to Learjet.

shall file and serve an opposing memorandum of law no later than fourteen (14) days after service of the motion."). Brown moved for his *first* extension of time on that day (November 9, 2023). *See* First Motion for Extension of Time [ECF No. 59]. Despite our misgivings about a party asking for an extension of time on the very day his response was due, we granted that motion. *See* November 10, 2023, Paperless Order [ECF No. 60]. But, in a move that would presage future events, Brown couldn't meet this second deadline either, so he submitted a *Second* Motion for Extension of Time [ECF No. 61], which we again granted, *see* November 28, 2023, Paperless Order [ECF No. 64]. In what might have started to seem like a joke, Brown *still* couldn't comply with this *third* deadline, so he filed his *Third* Motion for Extension of Time [ECF No. 65], which we again granted, *see* December 5, 2023, Paperless Order [ECF No. 66] (ordering Brown to respond by December 8, 2023).

Amazingly, though, that was just the beginning of Brown's problems. Rather than ask for another extension of time, Brown just blew this *fourth* deadline—December 8, 2023—so we closed his case to adjudicate the MSJ. *See* December 14, 2023, Paperless Order [ECF No. 67] (noting that, although Brown's response was due on December 8, 2023, "[t]hat date has come and gone, and yet we see nothing on the docket from the Plaintiff"). But Brown re-surfaced twelve days later, on December 20, 2023, with his *Fourth* Motion for Extension of Time [ECF No. 71], which we (very charitably) also granted, *see* December 20, 2023, Paperless Order [ECF No. 73]. One might have thought that this would be the end of our saga. But Brown was just getting started. When he couldn't meet our *fifth* deadline, he filed his *Fifth* Motion for Extension of Time [ECF No. 80],[2] which we (in retrospect foolishly) likewise granted, *see* January 1, 2024, Paperless Order [ECF No. 81]. This time, we clarified any possible confusion: "The Plaintiff must file his opposition to the Defendant's MSJ . . .

---

[2] The Plaintiff incorrectly called this his "fourth" motion for extension of time—an understandable mistake given the sheer number of extension requests he's submitted. From now on, we'll use our numbering scheme for these motions.

by 11:59 PM on January 2, 2024. **NO FURTHER MOTIONS FOR EXTENSION OF TIME WILL BE GRANTED**." *Ibid.*

On January 3, 2024, Brown finally filed something substantive on the docket: his Statement of Material Facts ("Brown Facts") [ECF No. 82]. But this wasn't right, either. His muddled response to Learjet's Facts only addressed Learjet's first ten facts—leaving paragraphs 11 through 83 undisputed.[3] *See generally ibid.* (responding to facts ¶¶ 1–10 and then offering some disconnected factual statements about Learjet's internal dispute policies). As bad as all this was, it paled in comparison to the fact that Brown had *still* not filed *any opposition* to Learjet's MSJ itself. Undeterred by this omission, later that same day, Brown filed his *Sixth* Motion for Extension of Time [ECF No. 83], requesting an additional 72 hours to file his opposition to the MSJ. Hoping that this would be the end of it—and proving the old adage that no good deed goes unpunished—we granted this *sixth* request. *See* January 3, 2024, Paperless Order [ECF No. 84]. But (and we have no words left to describe just how unprecedented this has all been) that *seventh* deadline—January 5, 2024—came and went without *any* filings from Brown. *See generally* Docket.

Trying to understand what was going on, we held a status conference on January 10, 2024, so that we could hear directly from both parties' lawyers. At that hearing, Brown's counsel mentioned some of his medical problems, and we offered to close and stay the case for several weeks until his condition improved. But Brown's lawyer turned down our offer and insisted that he would file his opposition to the MSJ by January 19, 2024 (an *eighth* deadline). *See* January 10, 2024, Paperless Minute

---

[3] Under Local Rule 56.1(c): "All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. FLA. L.R. 56.1(C). We've reviewed the record evidence—and, where we've found support for Learjet's Statement of Undisputed Facts ("Learjet Facts") [ECF No. 58] ¶¶ 11–83, we'll deem those facts admitted. *See Flynn v. R.F. Supply, Inc.*, 2014 WL 12531295, at *1 (S.D. Fla. Sep. 19, 2014) (Dimitrouleas, J.) ("Therefore, the facts [p]laintiff alleges that have not been addressed by [d]efendants are deemed admitted for purposes of the summary judgment proceedings if supported by record evidence.").

Entry [ECF No 88]. Still hopelessly naïve—and over Learjet's objection—we "**ORDERED**" the Plaintiff "to (1) file his memorandum of law in opposition to the Defendant's MSJ and (2) file an amended statement of material facts and additional facts by January 19, 2024." January 11, 2024, Paperless Order [ECF No. 89]. And we spelled it out for Brown as clearly as we knew how:

> **WE WILL NOT TOLERATE ANY MORE MISSED DEADLINES**. If the Plaintiff fails to file these documents by January 19, 2024, we will adjudicate the Defendant's 57 Motion for Summary Judgment without his response.

*Ibid.* But, as we should've come to expect by then, on January 19, 2024, Brown filed his Notice of Filing Exhibits [ECF No. 90]—*and nothing else*. Having seen enough, we finally directed the "Clerk of Court to **CLOSE** and **STAY** this case until we adjudicate the Defendant's MSJ." January 21, 2024, Paperless Order [ECF No. 91].

*Still* not appreciating our orders (or the concept of deadlines), *one month later*, Brown had the temerity to ask us, once again, to ignore our *eighth* deadline so that he could file—"within ten days"— the response brief he had been obligated to file way back on *November 9, 2023*. *See* the Plaintiff's Rule 60 Motion [ECF No. 92] at 10. But enough was enough, and we (finally) denied his request. As we explained:

> [W]e're past all that now. The Plaintiff's lawyer has made a mockery of our scheduling orders and has rewarded our generosity with false promises and blown deadlines.

Order Denying Eight Extension of Time [ECF No. 93] at 3. We also denied his request to vacate our January 21, 2024, Paperless Order because that "Order closing the case wasn't a judgment at all; it was only an administrative order that reflected the reality at the time—which was that the Plaintiff had failed to prosecute his own case." *Id.* at 6. Plus, we added, "there's been no mistake, inadvertence, or surprise here. And, as far as neglect goes, there's been plenty—but all of it has been, as we've explained, *inexcusable.*" *Ibid.*

Undeterred, Brown filed his response on April 8, 2024—in flagrant disregard of our orders, *four months* after his final response deadline, and *nearly six months* after the MSJ was filed. *See*

4

Stricken Response in Opposition to Motion for Summary Judgment [ECF No. 95]; Stricken Motion to Lift Stay [ECF No. 94]; and Stricken Statement of Disputed Facts [ECF No. 96]. Obviously, we struck these delinquent filings. *See* April 8, 2024, Paperless Order Striking Plaintiff's Untimely Motions [ECF No. 97] ("As we noted in our February 26, 2024, Order—in which we denied the Plaintiff's *eighth motion* for an extension of time to file these very documents—we'll adjudicate the Defendant's MSJ based only on the filings we have before us." (citing Order Denying Eight Extension of Time at 5)).

So, here we are, with an unopposed MSJ—which, after careful review, we now **GRANT**.

### THE FACTS[4]

Learjet Airframe & Powerplant Technicians ("A&P Techs") performs "[m]aintenance on . . . aircraft[.]" Joint Statement of Facts ("JSOF") [ECF No. 76] ¶ 3. Teams of A&P Techs are overseen by a Lead A&P, who is supervised by an Operations Supervisor. *See ibid.* ("Ordinarily, a Lead A&P Tech oversees a given team of A&P Techs."); *see also id.* ¶ 4 ("An Operations Supervisor serves as the first line supervisor of Lead A&P Techs and their teams."). "An Operations Supervisor" then "reports to the Operations Manager." *Id.* ¶ 5.

---

[4] On a motion for summary judgment, we describe the facts "in the light most favorable to [the non-moving party]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 n.2 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes only and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering Learjet's MSJ, then, we describe the facts in the light most favorable to the Plaintiff and rely on Learjet's Facts where the Plaintiff has failed to genuinely dispute a proposition Learjet has asserted there—which, recall, applies to almost all those facts. *See* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

Learjet hired Brown "in 2013 as a Lead at Learjet's Florida Service Center at the Fort Lauderdale Airport." *Id.* ¶ 7. "Prior to being directly hired by Learjet," Brown "worked at the Florida Service Center as a contractor." *Id.* ¶ 6. "As a Lead, starting in 2017 and until 2019, [Brown] worked on the midnight shift." *Id.* ¶ 17. Then, "[i]n 2019, Learjet management closed the night shift and transferred [Brown] to the day shift." *Id.* ¶ 21. "Following the transfer to the day shift, [Brown] kept his pay and [his] Lead A&P Tech title, [he] was assigned to Lead A&P Tech Juri Berchtold's crew, and [he] reported to Day Shift Supervisor Ron Lowe." *Id.* ¶ 22. Brown doesn't allege "racial harassment or discrimination from his supervisor Ron Lowe." Learjet's Statement of Undisputed Facts ("Learjet Facts") [ECF No. 58] ¶ 44 (citing Noel Brown Deposition ("Brown Dep.") [ECF No. 58-3] at 216:10–21 ("As far as discrimination from Rob Lowe personally, no.")). "Management never disciplined [Brown] between 2018 and 2020," JSOF ¶ 23, and issued him "'several' awards and recognitions for good performance," *id.* ¶ 24.

Brown hinges his claim on two racially discriminatory incidents that (he says) occurred after September 2018. *First*, "[o]n the day Ron DeSantis was elected the Governor of Florida in 2018," Brown "witnessed day shift Project Supervisor Rich Meilert walk into the Florida Service Center and say, 'Florida is still a cracker state. Florida is still a cracker state. White power, white power.'" *Id.* ¶ 20 (quoting Brown Dep. at 198:6–99:17 ("Whenever De[S]antis was hiring that that's [sic] the morning that the supervisor Rich Meiler[t] showed up to work . . . . He's an inspector. A white guy. Richard Meiler[t] worked came in through the tire shop. Came in and said exact quotation, Ron De[S]antis— no, said Florida is still a cracker state. Florida is still a cracker state. White power, white power.")). *Second*, "[o]n or about March 19, 2020," Learjet management "received a report that an employee, Quality Inspector Korie Agamie, made a loop out of a portion of a fall restraint system that replicated a 'noose' and told another employee to put their head in it." *Id.* ¶ 28 (citing Declaration of Dara Tompkins ("Tompkins Decl.") [ECF No. 58-1] ¶ 14).

6

"Learjet Senior Human Resources Business Partner Dara Tompkins promptly investigated [the] allegations" about Agamie. *Id.* ¶ 29. "As part of her investigation, Tompkins obtained a written statement from [Brown]." *Id.* ¶ 30. "At the conclusion of her investigation, Tompkins found the allegations against Korie Agamie to be substantiated. Learjet management decided to terminate Agamie's employment with Defendant, effective April 7, 2020, for violating Learjet's Harassment policy." *Id.* ¶ 31 (first citing Tompkins Decl. ¶ 16; and then citing Brown Dep. at 257:5–6 ("Well, [Lowe] kept his word. He looked into it and eventually Korey was terminated.")). As for Meilert's statement, Brown alleges in his Amended Complaint that "Selwyn Hayden, an African American A&P Technician, reported the racially humiliating and demeaning behavior of [Meilert] to the Human Resources Director, Andrew Krause[.]" AC ¶ 70. But none of the parties' facts, the Joint Statement of Facts, or Brown's Deposition include any support for Brown's allegation that Hayden (or anyone else) reported the incident to Learjet. *See generally* JSOF; Learjet Facts; Brown Facts; Brown Dep.

"Due to the global COVID-19 pandemic, Learjet—including its Florida Service Center in Fort Lauderdale—experienced an unprecedented slowdown in its aircraft service business beginning in March 2020." Learjet Facts ¶ 58 (citing Tompkins Decl. ¶ 17). "Due to the reduced workload and uncertain future business needs, Learjet furloughed a large number of its employee[s] across the United States, including in the Florida Service Center in Fort Lauderdale." *Id.* ¶ 32 (citing Tompkins Decl. ¶ 18). "On May 14, 2020, Learjet placed Plaintiff on furlough." JSOF ¶ 34. "Learjet informed all employees who were placed on furlough that they could be recalled at any time if [Learjet's] business needs . . . changed." Learjet Facts ¶ 63 (citing Tompkins Decl. ¶ 19). "By early fall 2020, the workload started to significantly increase at the Florida Service Center." JSOF ¶ 35. "As a result, Learjet management decided to recall all Lead A&P Techs—including [Brown]—from furlough starting in October 2020." Learjet Facts ¶ 73 (first citing Tompkins Decl. ¶ 23; and then citing Declaration of Ronald Lowe ("Lowe Decl.") [ECF No. 58-2] ¶ 17).

Here's where Brown runs into trouble. "On October 23, 2020, Operations Manager Gary Severino and Lowe spoke to [Brown] via telephone informing him that Learjet was recalling him from furlough and he was scheduled to work on October 28, 2020[,] at 4:00 pm." *Id.* ¶ 75 (citing Lowe Decl. ¶ 18). But Brown didn't return to work in October 2020. Instead, "[d]uring this call, [Brown] indicated he could not return to work until January 2021 because he was working on various projects around his house." *Ibid.* (citing Lowe Decl. ¶ 18). And Brown continued to ask for extensions of his furlough: "On October 28, 2020[,] at 12:10 pm, Tompkins received an email from [Brown]." JSOF ¶ 36. "In this email," Brown again "requested for a furlough extension until 'the new year [2021]'[.]" *Ibid.* (quoting October 28–29, 2020 Emails [ECF No. 58-1] at 43 (containing an email from Brown stating that he "ha[s] started lots of projects around the house that require my full attention and I am asking for a furlough extension until the new year")); *see also* Tompkins Decl. ¶ 24.

In the end, Brown "did not report to work on October 28, 2020[,] at 4:00 pm." JSOF ¶ 37. The next day, "[o]n October 29, 2020[,] at 12:46 pm, [Brown] sent Tompkins another email seeking reconsideration of the company's decision to deny his furlough extension request until January 2021." *Id.* ¶ 38 (citing October 28–29, 2020 Emails at 41 ("I am requesting that my extension request be reconsidered?")). "After [Brown] failed to report to work, Learjet terminated his employment with the company." *Id.* ¶ 39 (first citing Tompkins Decl. ¶ 28; and then citing Brown Dep. at 315:5–13).

Almost two years later, on September 5, 2022, Brown sued Learjet in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, alleging that Learjet violated Title VII of the Civil Rights Act, § 1981, and the FCRA. *See generally* Notice of Removal. After Learjet removed the case to federal court, Brown filed an Amended Complaint. *See generally* AC. There's no dispute that Brown is a member of a protected class. *See* JSOF ¶ 40 ("Plaintiff is a Black male[.]").

In his Amended Complaint, Brown asserts nine counts: (1) three counts of "Disparate Treatment Race Discrimination" under Title VII (Count I), AC ¶¶ 120–26, the FRCA (Count II), *id.*

¶ 127, and § 1981 (Count III), *id.* ¶ 128; (2) three counts of "racially hostile work environment" under Title VII (Count IV), *id.* ¶¶ 129–44, the FRCA (Count V), *id.* ¶ 145, and § 1981 (Count VI), *id.* ¶ 146; and (3) three counts of "retaliation for reporting discrimination based on race" under Title VII (Count VII), *id.* ¶¶ 147–56, the FRCA (Count VIII), *id.* ¶ 157, and § 1981 (Count IX), *id.* ¶¶ 158–59. Learjet has since moved for summary judgment on Brown's claims. *See generally* MSJ. As we explained above, Brown didn't respond to the MSJ or dispute most of Learjet's Facts. *See generally* Docket; Brown Facts.

### THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See ibid.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "If the non-moving party does not respond, then

summary judgment may be granted 'if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.'" *Fetchick v. Seminole Cnty.*, 719 F. App'x. 973, 974 (11th Cir. 2018) (quoting FED. R. CIV. P. 56(e)(3)). "Under these circumstances, the Court cannot grant the motion simply because it was conceded or procedurally defaulted." *Est. of Reed v. Nat'l Specialty Ins. Co.*, 2020 WL 5547922, at *6 (S.D. Fla. July 29, 2020) (Singhal, J.); *see also Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016). Rather, "[t]he District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Winston*, 843 F.3d at 505 (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015)). "This requires the Court to conduct an independent evaluation to determine whether the record and any undisputed material facts justify granting summary judgment." *Est. of Reed*, 2020 WL 5547922, at *6 (internal citations omitted). Further, "[a]ll material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. Civ. P. 56 does not apply." S.D. FLA. L.R. 56.1(c).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

"In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Amaya v. Vilsack*, 754 F. Supp. 3d 1311, 1318 (S.D. Fla. 2024) (Altman, J.) (citing *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.)). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994))).

## ANALYSIS

In its request for summary judgment on all nine counts, Learjet advances four principal arguments. *First*, Learjet maintains that most of Brown's claims are time-barred because "the majority of events on which Plaintiff bases his claims date back to 2012[.]" MSJ at 1. *Second*, Learjet contends that Brown "released all race discrimination claims based on allegedly discriminatory pay practices as part of Learjet's conciliation and settlement of claims with the Department of Labor Office of Federal Contract Compliance Program ('DOL OFCCP')." *Id.* at 2. "In light of that," Learjet says, "Brown's race discrimination and retaliation claims fail because he cannot establish a *prima facie* case that Learjet took an adverse employment action against him because of his race or retaliated against him for engaging in a protected activity." *Ibid. Third*, Learjet adds that, "[e]ven if he could establish a *prima facie* case, he cannot show that Learjet's reasons for the challenged employment decisions were a pretext for discrimination." *Ibid. Fourth*, Learjet argues that Brown "fails to state a *prima facie* case of unlawful hostile environment race harassment because the isolated comments and actions of his coworkers of which Brown complains were not 'severe or pervasive' within the meaning of relevant case law." *Ibid.*

"We analyze [Brown's] claims—whether under § 1981, the FCRA, or Title VII—under the same legal framework." *Michaels v. Sasser's Glass Works Inc.*, 662 F. Supp. 3d 1223, 1231 (S.D. Fla. 2023) (Altman, J.), *aff'd*, 2025 WL 588648 (11th Cir. Feb. 24, 2025); *see also Gant v. Kash'n Karry Food Stores, Inc.*, 390 F. App'x 943, 945 (11th Cir. 2010) ("Claims under both § 1981 and the FCRA are analyzed under the same framework as Title VII.").

## I.      Statute of Limitations

Learjet insists that "the majority of events on which [Brown] bases his claims" are time-barred. MSJ at 2 ("[T]he majority of events on which Plaintiff bases his claims date back to 2012 – well outside of Section 1981's four-year statute of limitation, which has the longest statute of limitation among the three statutes on which Plaintiff bases this action."). And we agree. Judge Singhal of our Court considered this same argument (also advanced by Learjet) in a companion case and found as follows: "The lengthiest statute of limitation on [p]laintiff's claims is for the § 1981 claims, which is four years. Plaintiff's Complaint span his entire 19-year career at Learjet. Only incidents that fall within the statute limitation will be considered here." *Murray v. Learjet, Inc.*, 2024 WL 1723697, at *1 (S.D. Fla. Jan. 31, 2024) (Singhal, J.), *motion for relief from judgment denied*, 2024 WL 1723723 (S.D. Fla. Mar. 19, 2024) (citing *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338–39 (11th Cir. 2008)).[5] On appeal, the Eleventh Circuit affirmed Judge Singhal's conclusion "that most of the alleged events fell outside the statute of limitation" and agreed with his decision not to consider any events that occurred beyond the outer limit of the statutory window. *Murray v. Learjet, Inc.*, 2024 WL 4707968, at *1 (11th Cir. Nov. 7, 2024). We'll do the same here.

### a.   Brown's Section 1981 claims are time-barred before September 5, 2018

Section 1981 "prohibits intentional race discrimination in the making and enforcement of . . . employment contracts." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (cleaned up). "The statute

---

[5] The plaintiff in that case also brought claims under Title VII, § 1981, and the FCRA.

for Section 1981 claims is four years and begins to run when plaintiffs should reasonably have discovered the alleged violations," *Brantley v. Muscogee Cnty. Sch. Dist.*, 535 F. App'x 912, 914 (11th Cir. 2013), and "can file suit and obtain relief," *Wallace v. Kato*, 549 U.S. 384, 388 (2007). Brown first raised his § 1981 claims on September 5, 2022, when he filed his complaint in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County. *See* Notice of Removal. In other words, "any § 1981 claims by [Brown] based on alleged acts of race discrimination predating [September 5, 2018,] are time-barred because they were not brought within the four-year limitations period." *King v. ST Aerospace Mobile, Inc*, 2013 WL 2635926, at *9 (S.D. Ala. June 11, 2013) (Steele, C.J.); *see also Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 972 (11th Cir. 2008) (finding that the statute of limitations for "§ 1981 . . . claims is measured from the date plaintiffs filed this lawsuit").

### b. Brown's FCRA claims are time-barred before May 28, 2020

The FCRA "provides for a private right of action for violation of any Florida discrimination statute." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1204 (11th Cir. 2007). "As a prerequisite to bringing an employment discrimination claim under the FCRA, an employee must file a complaint with the Florida Commission on Human Relations or the EEOC within 365 days of the alleged FCRA violation." *Rainey v. United Parcel Serv., Inc.*, 816 F. App'x 397, 401 (11th Cir. 2020); *see also* FLA. STAT. § 760.11(1) ("Any person aggrieved by a violation of ss. 760.01-760.10 may file a complaint with the commission within 365 days of the alleged violation[.]"). In other words, "[c]laims under the FCRA are subject to a 365-day statute of limitations." *Williams v. Fla. Atl. Univ.*, 2016 WL 1089423, at *3 (S.D. Fla. Mar. 21, 2016) (Gayles, J.) (citing FLA. STAT. § 760.11(1) (2015)). "A claim is time barred if not filed within these time limits." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

Brown filed his Charge of Discrimination on May 27, 2021. *See* Brown EEOC Charge of Discrimination [ECF No. 57-2] (noting a submission date of "05/27/2021"). We'll therefore only consider Brown's FCRA claims to the extent they arise from allegedly discriminatory acts that occurred

*after* May 28, 2020. *Cf. Jennings v. R.T.G. Furniture Corp.*, 2022 WL 4955385, at *3 (M.D. Fla. Oct. 4, 2022) (Barber, J.) ("Any claim based on this review, however, is time-barred because it occurred more than one year before Plaintiff filed her administrative complaint with the EEOC on October 23, 2019.").

### c. Brown's Title VII claims are time-barred before July 31, 2020

"[T]o sue under Title VII in Florida,[6] a plaintiff must file a charge with the EEOC 'within 300 days after the alleged unlawful practice occurred.'" *Edmunds v. Asurion, LLC*, 2024 WL 620932, at *10 (S.D. Fla. Feb. 14, 2024) (Altman, J.) (citing 29 U.S.C. § 626(d)). Brown filed his charge of discrimination with the EEOC on May 27, 2021. *See* Brown EEOC Charge of Discrimination (showing "05/27/2021" as the "date" submitted).[7] So, Brown may rely only on those alleged discrete discriminatory acts that occurred *after* July 31, 2020.

---

[6] "Florida is a 'deferral state,' which means that the state 'prohibits the unlawful employment practice at issue and has established state or local authorities to grant or seek relief for such practice.'" *Hernandez v. Palm Beach Cnty. Bd. of Cnty. Comm'rs*, 2021 WL 4459405, at *8 n.11 (S.D. Fla. Sep. 29, 2021) (Altman, J.) (cleaned up) (quoting *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262–63 (11th Cir. 2001)). So, while a plaintiff must ordinarily "file a charge complaining about an allegedly unlawful employment practice . . . with the EEOC within 180 days of the employment practice, [in a deferral state] the period for filing a charge with the EEOC may be extended to 300 days." *Ibid.* (citing *Nat'l R.R.*, 536 U.S. at 109 ("In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice; in all other States, the charge must be filed within 180 days. A claim is time barred if it is not filed within these time limits.")).

[7] One minor point. "After receiving a 'right-to-sue-letter' from the EEOC, a plaintiff has ninety days to file its Title VII claims with the district court." *Castellon v. City of Pompano Beach*, 2023 WL 5955455, at *3 (S.D. Fla. Aug. 30, 2023) (Singhal, J.). "The ninety-day requirement functions as a statute of limitations; the failure to bring the Title VII claim within the limitation period bars a plaintiff from bringing the action at a later date." *Ibid.* "The [p]laintiff bears the burden of establishing that her claims are timely." *Taylor v. Mayorkas*, 2024 WL 1929497, at *4 (S.D. Fla. May 2, 2024) (Altman, J.). The EEOC issued Brown a Notice of Right to Sue on June 6, 2022. *See* Brown EEOC Charge of Discrimination; *see also* AC at 35. But Brown didn't file his lawsuit until September 5, 2022—*ninety-one* days after the EEOC issued its notice. *See generally* Notice of Removal. And this one day would normally be fatal to Brown's claims. *See Starks v. Metro. Transp. Auth.*, 2022 WL 814668, at *3 (S.D.N.Y. Mar. 17, 2022) ("[A] Title VII claim is time barred if the claim is filed even one day late."). Here, however, September 4, 2022—the date on which Brown's Title VII claims became time-barred—fell on a Sunday. "The Eleventh Circuit has held that if the time period for filing ends on a weekend or

## II.      Brown Released Any Claims Arising from Pay Disparity

"In September 2019, following an audit by [DOL OFCCP] at the Defendant's Fort Lauderdale Florida Service Center, Learjet entered into a conciliation Agreement with the DOL OFCCP." JSOF ¶ 25 (citing Tompkins Decl. ¶ 12); *see also* Learjet Reconciliation Agreement [ECF No. 58-1] ¶¶ 9–18. "As part of the conciliation process, Brown and other minority Lead A&P Techs and A&P Techs received notice about the Conciliation Agreement and were given opportunity to opt-into a settlement related to alleged unequal pay practices." JSOF ¶ 26 (citing Tompkins Decl. ¶ 12). Brown decided to opt into the settlement and released "all claims related in any way to his compensation in exchange for payment of $1,344.41." Learjet Facts ¶ 52 (citing Tompkins Decl. ¶ 13).[8] Learjet argues that Brown "released all race discrimination claims based on allegedly discriminatory pay practices as part of Learjet's conciliation and settlement of claims with the [DOL OFCCP]." MSJ at 3. We agree.

Here, again, we find Judge Singhal's decision on this same issue—refusing in *Murray* to consider any allegations of pay disparity—instructive:

> In 2019, following an audit by the [DOL OFCCP], Learjet entered into a conciliation agreement. Murray and other minority A&P Techs were given notice and the opportunity to opt into a settlement relating to unequal pay practices. Murray received

---

holiday, then the claimant will be permitted 'to file suit on the day following the weekend or holiday[.]'" *Witherspoon v. Exel Inc.*, 2015 WL 13906509, at *3 (N.D. Ga. Sep. 24, 2015) (King, Mag. J.), *report and recommendation adopted sub nom. Witherspoon v. Exel Inc.*, 2015 WL 13906510 (N.D. Ga. Oct. 23, 2015) (quoting *Milam v. U.S. Postal Serv.*, 674 F.2d 860, 862 (11th Cir. 1982)). So, Brown's suit *was* timely when it was first filed.

[8] That release read, in relevant part, as follows:

> I hereby waive, release and forever discharge Learjet Inc., its predecessors, successors, related entities, parents, subsidiaries, affiliates and organizations, and its and their shareholders, directors, officers, employees, agents, successors, and assigns, of and from any and all actions, causes of action, damages, liabilities, and claims arising out of or actionable under Executive Order 11246, as amended, which I or my representatives (heirs, executors, administrators, or assigns) have or may have which related in any way to my compensation as a Technician on the basis of my race/ethnicity at any time prior to the date of my signature of this Release.

Brown's Release of Claims Under Executive Order 11246 [ECF No. 58-1] at 20–21. Brown has done nothing to challenge the authenticity of this release or to dispute Learjet's straightforward interpretation of its unambiguous terms.

a lump-sum payment and tendered a release of all claims related to compensation due to race and ethnicity.

*Murray*, 2024 WL 1723697, at *2 (cleaned up). As we've indicated, the Eleventh Circuit *affirmed* Judge Singhal's finding "that Murray released all claims of pay discrimination." *Murray*, 2024 WL 4707968, at *1 ("Murray received a letter from Learjet stating that he was covered under a settlement between Learjet and the Department of Labor regarding claims of pay discrimination based on race. The letter included a release agreement that Murray signed to receive back pay waiving all causes of action related to his compensation based on race before the date of his signing in October 2019."). As before, we'll follow Judge Singhal and the Eleventh Circuit here, which means that Brown *cannot* advance claims premised on allegations of pay disparity.

### III.    Counts I–III: Disparate Treatment Based on Race

Title VII, the FCRA, and § 1981 "prohibit[] employment discrimination based on race." *Mosley v. MeriStar Mgmt. Co., LLC*, 137 F. App'x 248, 251 (11th Cir. 2005). An employee "must establish the employer's discriminatory intent through direct or circumstantial evidence." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018). "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018). "To be direct evidence, the remark must indicate that the employment decision in question was motivated by race." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227–28 (11th Cir. 2002). The Eleventh Circuit has explained that "only the most blatant remarks, whose intent could be nothing other than to discriminate on the protected classification are direct evidence of discrimination." *Id.* at 1227 (cleaned up). Direct evidence would include, for instance, "a frank admission from a manager that he refused to hire an applicant because he was black." *Schweers v. Best Buy, Inc.*, 132 F. App'x 322, 324 (11th Cir. 2005) (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004)). Because Brown never suggests that he has any direct evidence of discrimination, he's forfeited any such claim. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th

Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."). If he's to prevail, then, it must be with circumstantial evidence.

"A plaintiff can establish intentional discrimination through circumstantial evidence in two ways." *Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1011 (11th Cir. 2019). *First*, the employee can "satisfy[ ] the burden-shifting framework set out in *McDonnell Douglas*." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc). *Second*, the employee can "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Id.* at 1221 n.6 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Even construed charitably, Brown's claims fail under either framework.

### a.  McDonnell Douglas

Under the *McDonnell Douglas* framework, a plaintiff *may* meet her burden by "showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (outlining the *prima facie* elements of discrimination). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). "If the plaintiff clears that hurdle, the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [treatment].'" *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 308–09 (2025) (quoting *McDonnell Douglas*, 411 U.S. at 802). "This burden is 'exceedingly light[.]'" *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994). Finally, "[i]f the employer meets its burden, the plaintiff must then show that the employer's stated reason is pretext for discrimination and/or retaliation." *Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1220 n.6 (S.D. Fla. 2022) (Altman, J.), *appeal dismissed sub nom. Marcellus Wills v. Walmart Assocs. Inc.*, 2022 WL 2821277

(11th Cir. June 17, 2022) (cleaned up). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013) (cleaned up).

### 1. *McDonell Douglas's Second Prong: Adverse Actions*

Learjet argues that Brown "fails to establish the second prong of a *prima facie* race discrimination claim." MSJ at 11. We disagree. Brown plainly "was subjected to [two] adverse employment action[s]" under the second prong of the *McDonnell Douglas* test. *Lewis*, 918 F.3d at 1220. *First*, Brown alleges that he "was furloughed before another Lead A&P Technicians with less seniority, Juri Berchtold ('Berchtold'), white male." AC ¶¶ 19–20. And "being furloughed—i.e., being put on leave without pay—generates a tangible harm and materially alters an employee's status with his employer. Thus, it qualifies as an adverse employment action." *Eliassaint v. RTG Furniture Corp.*, 551 F. Supp. 3d 1293, 1305 (M.D. Fla. 2021) (Mizelle, J.). *Second*, "[a]fter [Brown] failed to report to work, Learjet terminated his employment with the company." JSOF ¶ 39. "Termination is the ultimate employment decision, and certainly qualifies as an adverse employment action." *Lees v. Dynamic Educ. Sys., Inc.*, 2008 WL 821997, at *13 (M.D. Fla. Mar. 26, 2008) (Covington, J.). We therefore find that Brown has satisfied the second prong of the *McDonell Douglas* test.

But we agree with Learjet that Brown's other allegations—"applying but not being promoted to a Supervisor or a General Manager; being denied training; and being given undesirable assignments," MSJ at 12—*don't* qualify as adverse employment actions, *cf. Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) (explaining that a "tangible" or "adverse" employment action consists of "things that affect continued employment or pay—things like terminations, demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone").

We'll start with Brown's allegation that Learjet failed to promote him because of his race. Brown says that he "regularly inquired about and actively sought/applied for vacant promotional opportunities and, particularly between the 2018–2020 calendar years and the date of his separation from employment, was not selected for the positions of supervisory A&P Lead technicians (shift Supervisors), Operations Manager and General Manager." AC ¶ 54. That's not enough. "In the failure-to-promote context, the *prima facie* case consists of showing these elements: (1) that the plaintiff belongs to a protected class; (2) that she applied for and was qualified for a promotion; (3) that she was rejected despite her qualifications; and (4) that other equally or less-qualified employees outside her class were promoted. The comparators for the fourth prong must be 'similarly situated in all relevant respects.'" *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010). Learjet contends that Brown "fails to establish the first prong because he does not proffer any evidence showing exactly when he applied for the Supervisor or the GM position." MSJ at 12. And we agree.

In our Circuit, "[t]o make out a *prima facie* case in a failure to promote case, the plaintiff needs to show, among other things, that she 'applied for and was qualified for a promotion.'" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2013) (quoting *Brown*, 597 F.3d at 1174). Brown hasn't done that. In fact, Brown has *never* identified any *specific* position he *actually* applied for. Here's what Brown said about this at his deposition:

> Q: How many times did you apply for supervisor?
>
> A: Every opportunity that came aboard. Every time I saw a position available, I applied
>
> for it.

Brown Dep. at 209:1–4. But he has never said what these positions were, how much they paid, what the job responsibilities entailed, or anything else about them. *See id.* at 209:11–14 ("Q: How many times did those positions came up? A: I don't remember."). Nor did Brown say *when* he applied for these positions. Here's that exchange:

Q: When did you apply for a supervisor position?

A: I don't remember the date, sir. I'd have to have the records in front of me.

Q: What do you remember?

A: I remember I didn't get them.

*Id.* at 205:18–23; *see also id.* at 207:2–4 ("Q: So you don't remember specifically? A: I just know they would come up and I would just apply."); *id.* at 209:18–21 ("Q: When did you apply for a GM position? A: Whenever it came up. Whenever, whoever is vacating at the time. I don't remember specific, but I remember seeing it online and applying for it.").

The Eleventh Circuit hasn't told us whether a plaintiff's general allegation that he applied "[e]very time I saw a position available" is sufficient to show that the plaintiff "applied for" a promotion within the meaning of *McDonnell Douglas*. But we don't think it is. *See, e.g., Harrison v. N. Shore Univ. Hosp.*, 2008 WL 656674, at *1 (E.D.N.Y. Mar. 6, 2008) (granting summary judgment on failure-to-promote-claims where the "[p]laintiff generally mentions defendant's failure to promote him to an MRI position, but does not provide specific dates for those occurrences"); *Scott v. Ala. Dep't of Hum. Res.*, 2017 WL 2462651, at *11 (N.D. Ala. June 7, 2017) (granting summary judgment on failure-to-promote claims where the plaintiff didn't identify *specific* promotions and said only that "[s]everal of the persons selected for the promotional positions [the plaintiff] was denied were" outside her protected class, because the allegations "do[ ] not identify which promotions she was denied or who received those promotions"). Without identifying the specific positions he applied for, when he applied for them, or what their job responsibilities were, Brown can't meet two crucial requirements of a failure-to-promote case. *Cf. Hernandez v. AT&T Servs., Inc.*, 2017 WL 5197504, at *10 (M.D. Fla. Feb. 27, 2017) (Conway, J.) (granting the defendant's motion for summary judgment on a failure-to-promote claim where, "in vague terms, [p]laintiff alleges that he was not promoted," even though "aa failure to promote claim requires a showing that 'other equally or less qualified employees who were

not members of the protected class were promoted.' Plaintiff has not attempted to make such a showing as he has failed to identify any positions applied for, list his qualifications for such positions, name employees who were hired for positions he applied for, or show that he was more qualified than those employees who were hired instead of him." (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004))).

*First*, since Brown hasn't told us anything about these alleged promotions, he hasn't shown that he was *qualified* for the positions he says he was seeking. And, as we've said, "[t]o make out a *prima facie* case in a failure to promote case, the plaintiff needs to show, among other things, that she 'applied for *and was qualified for a promotion*.'" *Kidd*, 731 F.3d at 1204 (emphasis added) (quoting *Brown*, 597 F.3d at 1174).

*Second*, without identifying *which* specific positions he applied for, Brown can't demonstrate "that other employees of similar qualifications who were not members of the protected group were indeed promoted at the time [his] request for promotion was denied." *Brown*, 597 F.3d at 1179; *see also McCann v. Tillman*, 526 F.3d 1370, 1375 (11th Cir. 2008) (holding that "a prima facie case of discriminatory failure to promote requires a showing that other equally or less qualified employees who were not members of the protected class were promoted" (cleaned up)). To identify a relevant comparator, after all, Brown would need to point to a *specific* employee who was promoted over h for a *specific* promotion. *See Hernandez*, 2017 WL 5197504, at *10 ("[A] failure to promote claim requires a showing that 'other equally or less qualified employees who were not members of the protected class were promoted.'" (quoting *Wilson*, 376 F.3d at 1089)). And Brown hasn't done that. Even after viewing the evidence in the light most favorable to Brown—and drawing all reasonable inferences in his favor—we conclude that Brown hasn't "come forward with [any] specific facts" about other similarly situated employees who were *not* part of his protected group and who *did* receive the promotions he now claims he didn't get. *Bailey*, 284 F.3d at 1243. We therefore conclude that the phrase "applied for

and was qualified for a promotion," *Brown*, 597 F.3d at 1174, requires the plaintiff to identify *specific* instances in which the plaintiff applied for (and was denied) promotions. Because Brown hasn't done that, his failure-to-promote claim fails.

Brown's assertion that "formal schooling/training opportunities . . . were denied [to] Plaintiff but were provided" to employees outside his protected class, AC ¶ 52, fares no better. "To evaluate the sufficiency of proof of a *prima facie* case of discriminatory training, courts typically require the plaintiff to show each of the following elements: (i) that the plaintiff belongs to a protected class; (ii) that the employer provided training to its employees; (iii) that the plaintiff was eligible for the desired training; and (iv) that he was denied training opportunities provided to similarly situated employees outside the protected class." *Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054, at *17 (S.D. Ala. Apr. 11, 2011) (Steele, C.J.) (collecting cases). Brown fails to satisfy the third and fourth elements of this test.

Brown and Learjet agree that he "requested to go to 'every school' that was available such as the Global School." Learjet Facts ¶ 19. But Brown has provided *no* evidence that he was eligible for these trainings or that similarly situated non-black employees *were* offered these same opportunities. *See Newman v. Career Consultants, Inc.*, 470 F. Supp. 2d 1333, 1346 (M.D. Ala. 2007) (Fuller, C.J.) ("[A] plaintiff must show that . . . the defendant provided training to its employees [and] the plaintiff was not provided training under circumstances giving rise to an inference of discrimination."). The only thing Brown *does* say is that he "do[esn't] know why" he wasn't offered the training. Brown Dep. at 130:7–8 ("I never went to school. They refused to send me to school. I don't know why."). But that's essentially an admission that, even viewing the evidence in the light most favorable to him, Brown hasn't made out a *prima facie* case of discriminatory training.

Brown's claim that he was given lesser work assignments likewise fails. Brown says that, although he's "a lead technician working on Juri's crew in day shift," his supervisor (Berchtold) was

"giving me panels to removed [sic]," Brown Dep. at 242:22–24—a low-level job that, according to

Brown, Berchtold "wouldn't give [ ] to anybody else, but me," *id.* at 242:3–5. Brown also alleges that

"[t]hat's when everything started going bad because around 2018 -- October of 2019 is when I

transferred to that crew to become the lead. And my first assignment was to go to Palm Beach to

bring a Global back. So I had to go up there, get with the crew. And do all these tests in flight and

bring the airplane back. That was my first assignment. Again, this is a -- you don't give that to nobody."

*Id.* at 245:4–12. But far from suggesting that these were *lesser* work assignments, Brown was clear that

he got those assignments because he was *good* at his job. Here's how that part of his testimony went

down:

> Q. So why do you think they gave you this assignment though?
>
> A: He just he gave me the lead position and he gave me the assignment. Again because he knows I took the time, energy and effort to learn how to be good.
>
> Q: Any other reason you think he gave you that assignment?
>
> A: Because he knew I took the time, energy and effort to learn how to be good. Not because they sent me to school. None of that. Because he knows that I was going to take of[f] it [sic] like it's supposed to.

*Id.* at 246:4–19. Notably, Brown never says that these duties were outside his original job description—

or that they were given to him *because of* his race. *See generally* Brown Dep.

Here, again, we find Judge Singhal's *Murray* decision helpful. The plaintiff there had similarly

alleged that he was given "dirty jobs," *Murray*, 2024 WL 1723697, at *3—a claim that, in Judge

Singhal's view, was simply unsupported by the record:

> Nothing in the record before this Court points to an adverse employment action. To the contrary, Murray never received an adverse employment review and was always rated "good or very good." Although Murray complains about the nature of a few job assignments, he also acknowledges that his higher level of skill made him the "go-to-guy" for certain tasks. Further, he has not shown that only Black A&P Techs were assigned to do "dirty" jobs such as cleaning fuel tanks or toilets. He could not name one non-Black comparator A&P Tech who was not required to work on fuel tanks or toilets.

*Ibid.* (internal citations omitted). So too here. Like the *Murray* Plaintiff, Brown received excellent reviews and was given difficult jobs *not* because he was black, but because he *excelled* at his job. *Cf. Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) ("[T]he essence of a disparate treatment claim under Title VII is that an employee or applicant is intentionally singled out for adverse treatment on the basis of a prohibited criterion."). And, as we've said, the Eleventh Circuit affirmed Judge Singhal's decision, saying:

> There is no evidence that the jobs Murray was assigned were not already within his job duties, such that they could constitute a change in his employment conditions. And Murray admitted he was assigned those jobs because he performed them well. Even if the assignments to VFG testing and to service fuel tanks and toilets could constitute adverse actions, Murray failed to identify any similarly situated comparators who were treated differently. Murray received good ratings, never applied for a promotion, and voluntarily retired. The district court did not err in concluding he had failed to establish an adverse action or that similarly situated comparators were treated more favorably.

*Murray*, 2024 WL 4707968, at *2 (first citing *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55, 359 (2024); and then citing *Burke-Fowler v. Orange County*, 447 F.3d 1319, 1323 (11th Cir. 2006)). The Eleventh Circuit, in short, has already held that a similarly situated plaintiff *didn't* assert a viable work-assignment claim when those work assignments (1) fell within the plaintiff's original job duties and (2) were given to the plaintiff because he was *good* at his job. *See ibid.* Since Brown hasn't given us any reason to reach a different result, we likewise find Brown's work-assignment claim insufficient.

### 2. *McDonell Douglas's Fourth Prong: Similarly Situated Comparator*

To recap, Brown has identified two adverse employment actions—his March 2020 furlough and his October 2020 termination. But Learjet counters that "he cannot establish the [fourth] prong by proffering a similarly situated non-Black Lead A&P Tech who was treated better than him in connection with Learjet's decision to terminate his employment after [Brown] did not show up to work." MSJ at 10.[9] "To meet the fourth prong, a comparator must be 'similarly situated in all material

---

[9] Learjet incorrectly assumes that Brown's furlough *didn't* constitute an adverse employment action.

respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis*, 918 F.3d at 1228). A similarly situated comparator "will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Ibid.* These considerations "leave[ ] employers the necessary breathing space to make appropriate business judgments." *Lewis*, 918 F.3d at 1228. Brown has failed to meet this standard.

### i.  **Brown's Furlough Doesn't Satisfy** *McDonnell Douglas*

With respect to the furlough, Brown must show that Learjet chose not to furlough a non-black employee, who was "under the jurisdiction of the same supervisor," "share[d] [Brown's] employment history," and "reasonably" could not be "distinguished" from Brown. *Earle*, 843 F. App'x at 166. But Brown has *admitted* that "his race . . . had absolutely nothing to do with Lowe's decision to place him on furlough in 2020." Learjet Facts ¶ 72 (citing Lowe Decl. ¶ 16 ("Plaintiff's or any other employee's race or any other protected trait or protected activity had absolutely nothing to do with my decision to select that employee for furlough in 2020."))[10] This alone defeats Brown's claim. *See Jacobs v. Biando*, 592 F. App'x 838, 841 (11th Cir. 2014) (affirming dismissal of a race-discrimination claim because the plaintiff "did not allege that the reason [she was] mistreated [ ] or falsely accused and then fired [ ] was because she was African American" and holding that, "[t]o be actionable under

---

[10] The parties dispute whether Brown volunteered for furlough. According to Brown, he "did not go to any body and say I want to be furloughed from work today. I did not do that, sir." Brown Dep. at 268:11–25. On the other hand, Learjet's "[m]anagement contends that [Brown] volunteered to be placed on furlough." Learjet Facts ¶ 67 (citing Lowe Decl. ¶ 13). But that doesn't matter because, "[r]egardless of whether Plaintiff volunteered for furlough or not, Lowe would have selected Plaintiff for furlough in May 2020 because Plaintiff was assigned to the second shift." Learjet Facts ¶ 68 (citing Lowe Decl. ¶ 13).

Title VII, the harassing conduct or the adverse employment action must be *because of* the employee's protected characteristic, in this case race").

But Brown's claim fails even without this concession. The only comparator Brown points to is Juri Berchtold. *See* Brown Dep. at 267:4–5 ("I have way more seniority then Juri Berchtold. He stayed."). But Brown has *admitted* that, "with the exception of Adan Caicedo and Matt Chan, all Lead A&P Techs within the scheduled maintenance team were placed on furlough at one time, whether voluntarily or involuntarily, *including Juri Berchtold*." Learjet Facts ¶ 69 (emphasis added). And both Lowe's and Tompkins's depositions corroborate this concession. *See* Lowe Decl. ¶ 13 ("Indeed, between April 2020 and October 2020, with the exception of Adan Caicedo and Matt Chan, all Lead A&P Tech within the scheduled maintenance team were placed on furlough at some point, whether voluntarily or involuntarily, including Juri Berchtold."); Tompkins Decl. ¶ 22 (same). There's thus no evidence for the proposition that Berchtold *wasn't* furloughed. Brown's reliance on Berchtold's situation thus *supports* Learjet's argument that the company furloughed *all* Lead Techs—irrespective of race.

And, even if Brown had identified Caicedo and Chan (the only two Lead A&P Techs who weren't furloughed) as his comparators (which he doesn't), his claim would *still* fail. Again, Brown *admits* that "Caicedo was not furloughed because he was the only Sheetmetal lead and his expertise was required at all times," Learjet Facts ¶ 70 (citing Lowe Decl. ¶ 14), and that "Chan was not furloughed because he was the only Lead covering the weekend shift and also served as an Acting Supervisor," *id.* ¶ 71 (citing Lowe Decl. ¶ 15). Caicedo and Chan are thus not "similarly situated [to Brown] in all material respects." In other words, even after viewing the evidence in the light most favorable to Brown—and drawing all reasonable inferences in his favor[11]—we conclude that Brown

---

[11] As we must. *See Pennington*, 261 F.3d at 1265.

hasn't "come forward with [any] specific facts" showing that a similarly situated comparator wasn't furloughed when he was. *Bailey*, 284 F.3d at 1243.

But here's the thing: *Even if* Brown could establish a *prima facie* case, his claim would fail under *McDonnell Douglas*'s burden-shifting framework. Recall that, if the plaintiff makes out a *prima facie* case, "the burden shift[s] to the defendant to rebut the presumption of [discrimination] by producing legitimate reasons for the adverse employment action." *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006). And Learjet offers a plainly legitimate reason for the furloughs: the COVID-19 pandemic. In fact, Brown has *admitted* (and the record supports)[12] that Learjet furloughed him (and everyone else) *because of* the pandemic. *See* Learjet Facts ¶¶ 58, 62; *see also Fernandez v. Hotwire Commc'ns, Ltd.*, 2022 WL 4598638, at *12 (S.D. Fla. Sep. 30, 2022) (Altman, J.) (holding that the employer's decision to fire the plaintiff as part of "the [defendant's] COVID-19 reduction in force" "satisfied [the defendant's] burden of offering legitimate, non-discriminatory reasons"); *Tovar v. Callisonrtkl Inc.*, 2024 WL 4630628, at *1 (D.C. Cir. 2024) (holding that the defendant "proffered legitimate, non-retaliatory reasons for appellant's termination: her poor performance and a company-wide reorganization due to the COVID-19 pandemic." (citing *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010))); *Phillips v. Stallion Oilfield Servs., Ltd.*, 674 F. Supp. 3d 214, 221 (W.D. Pa. 2023), *dismissed*, 2023 WL 9022672 (3d Cir. 2023) (finding that the defendant "present[ed] a non-discriminatory reason for firing" the plaintiff where employer showed that the plaintiff was "laid off due to lack of work caused by a downturn in the industry" during the COVID-19 pandemic).

---

[12] *See* Tompkins Decl. ¶ 17 ("Due to the global COVID-19 pandemic, Learjet - including its Florida Service Center in Fort Lauderdale - experienced an unprecedented slowdown in its aircraft service business beginning in March 2020. Due to the reduced workload, the opportunities to work overtime for Technicians significantly declined."); *see also* Lowe Decl. ¶ 12 ("Moreover, due to the reduced workload and uncertain future business needs caused by the COVID-19 pandemic, I had no choice but to furlough majority of my Lead A&P Techs at the Florida Service Center.").

### ii. Brown's Termination Fails to Satisfy *McDonell Douglas*

Brown's termination claims fail for similar reasons. As we've said, Brown was terminated after he requested a furlough extension and then failed to show up for work as required. As Learjet explains:

> It is undisputed that Learjet management at the Florida Service Center decided to recall all Lead A&P Techs from furlough in late October 11, 2020. It is also undisputed that, other than Plaintiff, there were no other Lead A&P Techs at the Florida Service Center who requested an extension of their furlough after management contacted them to return to work in October 2020. Accordingly, Brown cannot point to another Lead A&P Tech who was treated better than he was in connection with his request for a furlough extension until January 2021.

MSJ at 10–11 (first citing Learjet Facts ¶ 73; and then citing *id.* ¶ 80). On this issue, Brown has *never* given us his side of the story—which means that we can admit Learjet's version and reject Brown's claim on this basis alone. *See, e.g., Meridian Miami, LLC v. BB&T Ins. Servs., Inc.*, 2014 WL 11878360, at *3 (S.D. Fla. Sep. 30, 2014) (Williams, J.) ("When a party fails to challenge the statement of facts supporting a motion for summary judgment, those facts are deemed admitted." (citing S.D. Fla. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply."))).

But even if Brown had responded to this argument, we don't think it would have made any difference. The record, after all, includes no evidence of a similarly situated comparator—no evidence, in other words, of a white Lead A&P (or, for that matter, *any other employee*) who was told to return to work and who, despite failing to show up to work as required, *wasn't* fired. In fact, the record supports the opposite conclusion. *See generally* Docket. As Brown admitted: "There were no other Lead A&P Techs at the Florida Service Center who requested an extension of their furlough after management contacted them to return to work in October 2020." Learjet Facts ¶ 80 (citing Tompkins Decl. ¶ 29). And that makes sense, because (as we've indicated) Brown *admitted* that his "race . . . had nothing to

do with Learjet's decision to deny [his] request to extend his furlough until January 2021." *Id.* ¶ 81. Again, this concession is supported by *all the other* record evidence. *See, e.g.*, Tompkins Decl. ¶ 30 ("Plaintiff's race . . . had nothing to do with Learjet's decision to deny Plaintiffs request to extend his furlough until January 2021. Instead, the decision was purely driven by increased workload in fall of 2020."). And, despite having over **eleven** months to develop the factual record on this issue, Brown hasn't adduced a single piece of evidence to rebut this proposition. And that's sufficient to dispose of Brown's *McDonnell Douglas* claim here. *See, e.g.*, *Holmes v. City of Ft. Pierce*, 2022 WL 247976, at *6 (11th Cir. Jan. 27, 2022) (finding that the plaintiff failed to make out a *prima facie* case because the "alleged comparators did not engage in the same basic misconduct").

Again, though, *even if* Brown made out a *prima facie* case, his termination claim would *still* fail because the parties' joint facts *stipulate* that Learjet fired him after he failed to show up to work: "After Plaintiff failed to report to work, Learjet terminated his employment with the company." JSOF ¶ 39. Terminating an employee who fails to show up to work is obviously not discriminatory. *See Smith v. Constr. Datafax, Inc.*, 871 F. Supp. 2d 1226, 1239 (N.D. Ala. 2012) (Hancock, J.) ("Job abandonment is a legitimate, nonretaliatory reason to terminate an employee."); *see also Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1361 (11th Cir. 1999) (holding that an employer "may terminate an employee for a good or bad reason without violating federal law," as long as that reason isn't discriminatory); *Fernandez*, 2022 WL 4598638, at *16 ("Time and again, the Eleventh Circuit has reminded us that '[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'" (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (cleaned up))). And Brown hasn't shown that Learjet's explanation is mere pre-text. That's really the end of that.

### 3. *Conclusion*

The Eleventh Circuit has "said repeatedly that speculation about a fact or result is insufficient to survive summary judgment" because an "inference based on speculation and conjecture is not reasonable." *Gadsby v. Am. Golf Corp. of Cal.*, 557 F. App'x 837, 840 (11th Cir. 2014) (cleaned up). That's especially true when "a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact[.]" *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 656 (11th Cir. 1984). In this case, we don't need to speculate because Brown has *admitted* that he wasn't furloughed or terminated because of his race—a concession all the other record evidence supports. Because no reasonable jury could find for Brown on Counts I, II, and III, *cf. Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d, 1121, 1134 (11th Cir. 2020) ("[T]here must be enough of a showing that the jury could reasonably find for that party." (cleaned up)), we **GRANT** the Defendant's Motion for Summary Judgment as to those counts.

### b. **Convincing Mosaic**

Brown doesn't rely on the "convincing mosaic" theory in his Complaint—and he obviously doesn't address this doctrine in his non-existent summary-judgment papers. He's thus "forfeited any 'convincing mosaic' argument in support of his" "disparate-treatment discrimination claim" because the "briefing filed before [us] . . . included not a single specific 'convincing mosaic' argument directed at his [race] disparate-treatment discrimination claim." *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1274 (11th Cir. 2021); *see also McCreight v. AuburnBank*, 117 F.4th 1322, 1336 (11th Cir. 2024) (highlighting that the "decision in *Bailey* was based on the plaintiff's failure to raise any sort of argument in favor of his disparate treatment claim").[13]

---

[13] In *Murray*, the Eleventh Circuit affirmed Judge Singhal's summary-judgment order even though he only analyzed the plaintiff's race-discrimination claims under the *McDonnell Douglas* standard. *See Murray*, 2024 WL 4707968.

But even if Brown *had* advanced a convincing-mosaic argument, his claims would still fail. "As an alternative to the *McDonnell Douglas* burden-shifting test, a plaintiff can survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 890 (11th Cir. 2021). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (cleaned up). "A convincing mosaic 'may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual.'" *Fernandez*, 2022 WL 4598638, at *16 (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (cleaned up)). We'll therefore consider whether Brown's two adverse actions— his termination and his furlough—make out a *prima facie* case under a convincing-mosaic theory.

### 1.   Brown's Furlough

Brown's furlough claim fails all three prongs of the convincing-mosaic test. *First*, "[t]ellingly, the timing of relevant events in this case is anything but suspicious." *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1198 (11th Cir. 2024). Brown has *admitted* that, in March 2020, "Learjet furloughed a large number of its employee[s] across the United States, including in the Florida Service Center in Fort Lauderdale." Learjet Facts ¶ 32. And he has *conceded* (and the record supports)[14] that Learjet furloughed him (and everyone else) *because of* the COVID-19 pandemic.[15] "Here, there is no suspicious timing that

---

[14] *See supra* note 12.

[15] Even if Brown had claimed that he was furloughed because of his participation in the Agamie investigation of March 2020, *see* JSOF ¶ 28, his own admission that he was furloughed along with everyone else *because of* the pandemic would eviscerate any such claim. As for Meilert's statement about DeSantis, those comments were made in late 2018—eighteen months before Brown was furloughed, *see id.* ¶ 20, and are thus far too attenuated to suggest any "suspicious timing," *Ingram v. Houston Cnty. Bd. of Educ.*, 2017 WL 4017762, at *5 (M.D. Ala. Sep. 12, 2017) ("While a period as long as one month

would support a claim of discrimination. Considering the totality of the circumstances, the timing of [Brown's] termination 'is anything but suspicious.'" *Jackson v. Sumter Cnty., Ga*, 2025 WL 964235, at *6 (M.D. Ga. Mar. 31, 2025) (Gardner, C.J.) (quoting *Akridge*, 93 F.4th at 1198).

*Second*, Brown offers no evidence of "systematically better treatment of similarly situated employees." *See supra* III.a.2.i. Again, Brown has *admitted* that "all Lead A&P Techs within the scheduled maintenance team were placed on furlough at one time, whether voluntarily or involuntarily[.]" Learjet Facts ¶ 69.

*Third*, Learjet (as we've said) has offered a legitimate reason for the furloughs: the COVID-19 pandemic. *See supra* III.a.2.i; *see also Fernandez*, 2022 WL 4598638, at *12 (holding that the employer's decision to fire the plaintiff as part of "the [defendant's] COVID-19 reduction in force" "satisfied [the defendant's] burden of offering legitimate, non-discriminatory reasons"). And (again), far from showing that this reason was pretextual, Brown has *admitted* that Learjet furloughed him (and everyone else) *for that reason*. *See* Learjet Facts ¶¶ 58, 62.

### 2. Brown's Termination

And we come out the same way on Brown's termination claim. *First*, Learjet's decisions to deny Brown's request for extended furlough and to terminate him when he failed to show up for work are "anything but suspicious," *Akridge*, 93 F.4th at 1198, because Brown *admitted* that his "race . . . had nothing to do with Learjet's decision to deny [his] request to extend his furlough until January 2021," *id.* ¶ 81; *see also supra* III.a.2.ii. Plus, as we've seen, Brown admitted that he was terminated because he failed to report to work. *See* JSOF ¶ 39 ("After Plaintiff failed to report to work, Learjet terminated

---

between a protected activity and an adverse action is not too protracted to infer causation based solely on temporal proximity, a three-month interval between the protected activity and the adverse action cannot alone establish causation."); *Escarment v. Florida*, 2022 WL 22971934, at *7 (S.D. Fla. Apr. 11, 2022) (Altonaga, C.J.) (finding that, "even '[h]alf a year is too attenuated to infer a connection'" (quoting *Siff v. Audiology Distrib., LLC*, 2022 WL 73758, at *5 (11th Cir. Jan. 7, 2022))).

his employment with the company."); *see also Constr. Datafax, Inc.*, 871 F. Supp. 2d at 1239 ("Job abandonment is a legitimate, nonretaliatory reason to terminate an employee.").

*Second*, even if Brown could satisfy the first convincing-mosaic prong, the record includes no evidence of any similarly-situated comparator—or, for that matter, *any other employee*—who was told to return to work and who, despite failing to show up to work as required, *wasn't* fired. *See supra* III.a.2.ii. Brown therefore fails to produce any evidence of the "systematically better treatment of similarly situated employees." *Lewis*, 934 F.3d at 1185.

*Third,* again, Learjet has produced a legitimate, race-neutral reason for the termination—Brown's failure to report to work as required—and Brown has done nothing to suggest that this reason was mere pretext for discrimination. On the contrary, he's admitted that, "[a]fter Plaintiff failed to report to work, Learjet terminated his employment with the company." JSOF ¶ 39.

***

Brown, in short, has failed to make out a *prima facie* case of race discrimination under the convincing-mosaic theory.

## IV.    Counts IV–VI: Hostile Work Environment

"The legal standard for hostile work environment claims in this Circuit is well-settled." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010). "To establish a claim of a hostile work environment, an employee must prove that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The employee must prove five elements if he bases his harassment claim on race: (1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on his race; (4) that the harassment was severe or pervasive enough to alter the

33

terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability." *Ibid.* (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). "Workplace conduct is not measured in isolation." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (per curiam). "Rather, the evidence of harassment is considered both cumulatively and in the totality of the circumstances." *Reeves*, 594 F.3d at 808 (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1242 (11th Cir. 1999)). But a hostile-workplace claim is "only implicated in the case of a workplace that is 'permeated with discriminatory intimidation, ridicule and insult,' not where there is the 'mere utterance of an . . . epithet.'" *Miller*, 277 F.3d at 1276–77 (citing *Harris*, 510 U.S. at 21).

As an initial matter, we agree with Learjet that Brown "cannot point to a single act that occurred on or after May 28, 2020 that could be sufficient to establish a racially 'hostile' environment[.]" MSJ at 18. We therefore **GRANT** the Defendant's Motion for Summary Judgment as to Counts IV and V because any alleged conduct is time-barred under Title VII and the FCRA.[16] *See supra* I.b–c.

---

[16] Brown doesn't ask us to toll the statute of limitations. As the plaintiff, he "is charged with showing whether equitable modification of the limitations period is appropriate[.]" *Frame v. ADT Sec. Servs., Inc.*, 2007 WL 9702445, at *13 (N.D. Ga. Oct. 25, 2007), *report and recommendation adopted*, 2007 WL 9702824 (N.D. Ga. Nov. 30, 2007) (Walker, Mag. J.) (first citing *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 660 (11th Cir. 1993); and then citing *Munn v. Mayor & Aldermen of City of Savannah*, 906 F. Supp. 1577, 1585 (S.D. Ga. 1995)). But Brown "never designated the specific facts supporting the application of the continuing violations doctrine." *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007). Again, Brown has never advanced a theory of equitable tolling *at all*. "In ruling on a motion for summary judgment," we aren't "'obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim,' rather the nonmoving party must designate the specific genuine issues of material fact that preclude summary judgment[.]" *Ibid.* (quoting *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1069 (8th Cir. 2005)). We therefore "decline[ ] to craft a continuing violation doctrine argument on [Brown's] behalf." *Frame*, 2007 WL 9702445, at *13; *see also Busari-Ibe v. AGS-AECOM Co.*, 509 F. App'x 298, 300 (5th Cir. 2013) (holding that the plaintiff "waived her equitable tolling and continuing violations doctrine arguments because she failed to assert the arguments").

But Brown's § 1981 claims aren't time-barred because, as we've explained, they're timely all the way back to September 5, 2018. *See supra* I.a. As to this claim, though, Learjet argues that "the conduct [Brown] complaints about is not even close to being sufficiently severe or pervasive to alter the terms and conditions of his employment and create a discriminatory abusive work environment." MSJ at 16. As we've explained, "[t]he fourth element [of a § 1981 claim] requires a plaintiff to prove that the work environment is both subjectively and objectively hostile." *Adams*, 754 F.3d at 1249 (citing *Mendoza*, 195 F.3d at 1246). "Put differently, the employee must first establish that he subjectively perceived the environment to be abusive." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020) (cleaned up). "He then must satisfy the objective component by showing that his work environment was one that a reasonable person would find hostile or abusive." *Ibid.*; *see also Greene v. School Bd. of Broward Cnty.*, 2014 WL 3950387, at *10 (S.D. Fla. Aug. 12, 2014) (Moreno, J.) ("Harassment is *subjectively* severe and pervasive if the complaining employee perceives the harassment as . . . severe and pervasive, and harassment is *objectively* severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive."). In deciding whether a work environment was objectively hostile, our Circuit considers four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246 (citing *Allen*, 121 F.3d at 647).

Brown has pointed to four *possibly* hostile events. *First*, at an unspecified time, Brown "did not like certain assignments Berchtold gave him such as removing certain panels from the aircraft," Learjet Facts ¶ 45, and was chosen "for a difficult assignment involving bringing an airplane back from West Palm Beach," *id.* ¶ 46. *Second*, Brown "felt the management overly scrutinized his work and attacked him." *Id.* ¶ 47. *Third*, "[o]n the day Ron DeSantis was elected the Governor of Florida in 2018, Plaintiff witnessed day shift Project Supervisor Rich Meilert walk into the Florida Service Center and say,

'Florida is still a cracker state. Florida is still a cracker state. White power, white power.'" JSOF ¶ 20. *Fourth*, "[o]n or about March 19, 2020, Defendant management received a report that an employee, Quality Inspector Korie Agamie, made a loop out of a portion of a fall restraint system that replicated a 'noose' and told another employee to put their head in it." *Id.* ¶ 28 (citing Tompkins Decl. ¶ 14); *see also* Brown Dep. at 256:23–24 ("Hey, I see Korey playing with a noose at work. It should be on camera."). So, we must decide whether, given these incidents, "considered both cumulatively and in the totality of the circumstances," *Reeves*, 594 F.3d at 808, "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Adams*, 754 F.3d at 1248–49 (citations omitted). We conclude that they did not.

The first two incidents fall short because the record includes no evidence that these had anything to do with race—as required by the third prong of the *prima facie* test, which asks whether "the harassment was based on his race." *Id.* at 1249. We've already discussed this problem in the context of the first incident, *see supra* III.a.1.—Brown's claim that "he did not like certain assignments" and that he was chosen "for a difficult assignment involving bringing an airplane back from West Palm Beach," Learjet Facts ¶¶ 45–46 (citing Brown Dep. at 241:10–242:11, 245:1–247:9). In his deposition, remember, Brown *never* said that he received these assignments *because of* his race. *See* Brown. Dep. at 246:4–19. To the contrary, Brown *admitted* that he was given these assignments because he was *good* at his job. *Ibid.* ("He just he gave me the lead position and he gave me the assignment. Again because he knows I took the time, energy and effort to learn how to be good . . . . Because he knows that I was going to take of it like it's supposed to.").

As for the second incident, the record includes no support for the proposition that Learjet "management overly scrutinized [Brown's] work and attacked him" *because of* his race. Learjet Facts ¶ 47 (citing Brown Dep. at 221:5–15). And Brown never tells us how often (or in what ways)

management scrutinized his work or attacked him—yet another reason to reject this claim on the merits. *See Ahern v. Delta Air Lines, Inc.*, 609 F. Supp. 3d 1314, 1331 (S.D. Fla. 2022) (Gayles, J.) (finding that the plaintiff's "failure to identify record evidence regarding when and how often [her supervisor's] behavior occurred necessitates the Court's" granting summary judgment on her hostile-workplace claims). Indeed, when he was asked for an example of "management overly scrutiniz[ing] his work and attack[ing] him," Learjet Facts ¶ 45, Brown couldn't give a single specific example. Here's what he said on this point:

> Q: I'm asking you a question. You told me that you do little things mistakes or not mistakes. Whatever you do you're being -- it get[s] blown out of proportion and you're being attacked.
>
> A: But I'm saying to you from the day I begin to the day I left there that's how it was. So for you to ask me for specific dates, I can't give you specific exactly. But I can tell you from the day I started at Bombardier until I left that's how it was. I can't give you specific dates, sir. But I can tell you from the day I started at Bombardier until I left that's how it was.
>
> Q: Can you give me an example of a situation like that in 2019.
>
> A: I can't give you specific dates, sir. I'm sorry.

Brown Dep. at 221:5–20. Brown's vague and conclusory assertion that he was treated harshly isn't sufficient to support his hostile-workplace claim—especially because Brown *never* said that he was subjected to this extra scrutiny *because of* his race. For one thing, "instances of generalized 'needling and criticism' are insufficient as a matter of law to create a hostile work environment." *Ahern*, 609 F. Supp. 3d at 1331; *see also Baroudi v. Sec'y, U.S. Dep't of Veterans Affs.*, 616 F. App'x 899, 905 (11th Cir. 2015) (finding that the plaintiff had failed to show her work environment was objectively hostile and abusive based on what she perceived to be a "demeaning, threatening, and belittling manner" because she offered nothing more than her own vague and conclusory statements to support the claim); *Phifer v. Koch Foods of Ala., LLC*, 2024 WL 6845536, at *3 (M.D. Ala. Nov. 5, 2024) (Doyle, Mag. J.) (finding that "wholly conclusory allegations are insufficient to establish that [the plaintiff] experienced severe or pervasive harassment based on his race"); *Little v. CRSA*, 2017 WL 3431837, at *4 (M.D. Ala. 2017)

(Coody, J.) (rejecting as insufficient a "vague conclusory statement that . . . comments were routine . . . unsupported by facts."), *aff'd*, 744 F. App'x 679 (11th Cir. 2018); *Johnson v. Sunshine Rest. Partners, LLC*, 2010 WL 11504502, at *2 (S.D. Fla. 2010) (Martinez, J.) (granting motion to dismiss where plaintiff "failed to allege any non-conclusory facts regarding the harassment or hostile work environment she suffered."). For another, the *sine qua non* of a § 1981 claim is that an employee was treated differently because of his race. *See Jackson v. Geo Grp., Inc.*, 312 F. App'x 229, 234 (11th Cir. 2009) ("For discrimination claims under § 1981, the plaintiff must establish that he experienced 'an adverse employment action' in which he was treated differently from other employees because of his race." (quoting *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008))). As we've said, however, Brown has *never* testified that, during the relevant time period,[17] he was overly scrutinized or attacked

---

[17]     As we've explained, Brown's claims are time-barred before September 5, 2018 under § 1981, *see supra* I.a, before May 20, 2020 under the FCRA, *see supra* I.b, and before July 31, 2020 under Title VII, *see supra* I.c. Recall that "[w]e analyze [Brown's] claims—whether under § 1981, the FCRA, or Title VII—under the same legal framework." *Michaels*, 662 F. Supp. 3d at 1231. The "relevant time period" for Brown's claims, then, is (at the earliest) anything that occurred *on or after* September 5, 2018. But much of Brown's complaints about the way he was treated precede that date. So, for instance, when he was asked why he wasn't promoted "between 2014 and 2017," Brown Dep. at 154:5–6, Brown *twice* suggested that he wasn't promoted in those earlier years because he was black, *see id.* at 154:16–17 (speculating that "it[ ] [was] starting to seem because I was black"); *id.* at 230:13–14 (explaining that he wasn't promoted "because of the [t]he fact that I'm a black man"). But these earlier claims of discrimination don't affect our analysis because they occurred *before* September 5, 2018, and are thus time-barred.

At his deposition, Brown *did* testify that, at some point "[a]fter transferring to the day shift in 2019," *id.* at 216:10–11, he let Lowe, his supervisor, "know about how we were treated as people of color in the company," *id.* at 216:15–21 ("As far as discrimination from Ron Lowe personally, no. But he was my supervisor and I did let him know how I felt about the pay I was receiving. I also let him know about how we were treated as people of color in the company. So I spoke to him extensively about that."). But this doesn't help Brown because he never tells *us* how "people of color in the company" were treated, and he never gives *us* any specific examples of that ill treatment. These vague references, without specific facts, are not enough to survive summary judgment. *See Gooden v. I.R.S.*, 679 F. App'x 958, 963 (11th Cir. 2017) (holding that the plaintiff's "conclusory allegation that white employees are treated differently is insufficient to defeat summary judgment"); *see also Jacobs*, 592 F. App'x at 841 ("To be actionable under Title VII, the harassing conduct or the adverse employment action must be *because of* the employee's protected characteristic, in this case race[.]"); *Versfelt v. Sanza Food Serv.*, 2022 WL 479881, at *12, *17 (S.D. Fla. Feb. 16, 2022) (Altman, J.) (granting summary judgment for the defendant in an employment-discrimination case because the plaintiff "presented no

*because of* his race. So, even if we were to accept his vague and conclusory assertions that, from the day he joined the company, he was constantly being needled and harassed, we would *still* have no basis to conclude that this needling and harassment was directed at him because he was black—as opposed to some other reason (*e.g.*, because his coworkers didn't like him). These first two series of incidents thus fail to make out a *prima facie* showing of a hostile workplace.

We are, however, troubled by Brown's last two allegations: (1) that a supervisor said: "White power, white power" after Governor DeSantis was elected; and (2) that Agamie "replicated a 'noose' and told another employee to put their head in it." These statements (and conduct) are awful and reprehensible, and we in no way condone them. But, repugnant though they may be, both instances "clearly fall[ ] short of the type of evidence that this Circuit has recognized as direct evidence of discrimination," *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989), and two isolated incidents of racial animus simply don't create a "hostile work environment," *McCann*, 526 F.3d at 1378–79 (holding that several instances of racially derogatory language extending over a period of more than two years were "too sporadic and isolated" to establish that the employer's conduct was objectively "severe or pervasive"); *see also Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 900 (11th Cir. 2015) ("The few instances Plaintiff cites are not sufficiently egregious or frequent to support a claim of a hostile work environment."); *Sugarman v. Deutsche Bank Sec., Inc.*, 2010 WL 11506575, at *3 (S.D. Fla. Apr. 27, 2010) (Seitz, J.) (finding three isolated incidents plus one comment frequently made over the course of eleven months to be too infrequent to satisfy the objective component of the hostile-workplace test); *Ahern*, 609 F. Supp. 3d at 1331 (granting summary judgment because "statements, interspersed with a handful of isolated incidents, occurred over the course of approximately two years and were thus far too infrequent to have permeated the workplace with discrimination."); *but see Miller*,

---

. . . evidence of discrimination" and because "none of the evidence [the plaintiff] cite[d] support[ed] [his] claim").

277 F.3d at 1276–77 (affirming the district court's denial of summary judgment where co-workers "hurled [ ] ethnic slurs at [the plaintiff] three to four times a day" and the district court thus found this "conduct to be sufficiently severe and pervasive such that the terms or conditions of [the plaintiff's] employment were altered").

Since Brown has failed to make out a *prima facie* case of a hostile workplace, we **GRANT** the Defendant's Motion for Summary Judgment as to Count VI.

### V.        Counts VII–IX: Retaliation

Brown's retaliation claims likewise fail. Because Brown's § 1981 claims are time-barred to the extent they arise from conduct that occurred before September 5, 2018—and given that his Title VII and FCRA claims are untimely so long as they're premised on incidents that took place before July 31, 2020 and May 28, 2020 (respectively)—we'll only consider conduct that occurred after September 2018. Brown felt that Learjet management furloughed him in retaliation for his participation in the Agamie investigation. *See* Brown Dep. at 281:23–283:11. Here's what Brown said about this:

Q: Why do you think you were selected [for furlough] and Juri was not selected?

A: [G]oes back to that letter, sir. A retaliation about what I did. Once I crossed that line everything was downhill from there.

Q: What facts can you give me to support your position that the management retaliated[?]

A: Everything that I just told you. . . . The fact that I was informed that it was going to be to seniority. And I had at least six or seven years seniority over Juri Berchtold. That's a fact. We're doing it by seniority. I'm not on that list as far as I'm concerned for about three or four furloughs. Because there's a lot of people who come before me. . . . I get through on the second wave right after I complained about the guy playing with the noose. . . . I get furloughed. My assignments changed over. These things all happened in coincidental you feel. I don't think it's all coincidental, sir. I think these are all factual events that happened. I was there all this time. Getting Gem awards, being very productive, going on test flights. You don't just send anybody on a test flight on an airplane with a crew. So I'm doing all these things and all of a sudden now I'm getting furloughed.

*Ibid.* In other words, Brown is saying that Learjet furloughed him before it furloughed Berchtold because of his participation in the Agamie investigation. *See ibid.; see also* AC ¶ 97 ("It was, indeed, this persistent career-long hostile and abusive conduct on account of his race that also manifested itself in

the disparate treatment regarding the furloughs and the involuntary termination of his employment which also constituted status-based disparate treatment and unlawful retaliation.").

Learjet seeks summary judgment on these retaliation claims "because Brown cannot establish a *prima facie* case that Learjet subjected him to a retaliatory adverse employment action." MSJ at 15. Again, we disagree that Brown wasn't subjected to adverse employment actions. As we've said, we find that his furlough and his termination *did* constitute adverse actions. *See supra* III.a.1. Still, as we've established, none of Brown's *other* post-2018 allegations qualify as "adverse employment actions." So, Brown's *only* potentially-viable retaliation claims—*i.e.*, those arising within the statute of limitations— are his claims that Learjet furloughed him in May 2020 and then terminated him in October 2020 *in retaliation for* his participation in Learjet's investigation (and subsequent termination) of Agamie. *See* AC ¶ 97. But even these claims fail on the merits.

"Where, as here, there is only circumstantial evidence of retaliation, we use the burden-shifting framework of *McDonnell Douglas*[.]" *Tyler v. Kia Motors Mfg. Ga., Inc.*, 702 F. App'x 945, 949 (11th Cir. 2017). This test should look familiar. *First*, the plaintiff must satisfy his *prima facie* case of retaliation by showing: "(1) that [he] engaged in statutorily protected activity, (2) that [he] suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel*, 967 F.3d at 1134 (cleaned up). *Second*, "[t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* at 1135. *Third*, "[i]f the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the proffered reason was merely a pretext to mask [retaliatory] actions." *Ibid.* (cleaned up).

Brown's furlough-retaliation claim suffers from a fatal flaw we've discussed already—his concession that his "race or the fact that he participated in the Korie Agamie investigation had absolutely nothing to do with Lowe's decision to place him on furlough in 2020." Learjet Facts ¶ 72

(citing Lowe Decl. ¶ 16); *see generally* Brown Facts (failing to dispute Learjet Facts ¶ 72); *see also Meridian Miami*, 2014 WL 11878360, at *3 ("When a party fails to challenge the statement of facts supporting a motion for summary judgment, those facts are deemed admitted." (citing S.D. Fla. L.R. 56.1(c))).

Even if Brown hadn't admitted this fact, however—and even assuming that he could make out a *prima facie* case of retaliation—his claim would still fail because Learjet has proffered a legitimate, non-discriminatory reason for furloughing Brown (along with everyone else): the COVID-19 pandemic. "To avoid summary judgment[,] the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination. A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up). At this third step, "'[t]he plaintiff must meet the reason proffered head on and rebut it.'" *Versfelt v. Sanza Food Serv., LLC*, 2022 WL 479881, at *15 (S.D. Fla. Feb. 16, 2022) (Altman, J.) (quoting *Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007)). But Brown has produced *no evidence* for the view that Learjet's COVID-19 justification was a mere pretext for discrimination. Indeed, Brown failed even to argue that Learjet's reason was pretextual (or to respond to *any* of Learjet's arguments). *See supra* III.a.2.i.

We're similarly not persuaded by Brown's termination-retaliation claim. For one thing, Brown testified only that he was *furloughed* in retaliation for his participation in the Agamie investigation, not that he was *fired* for that participation. *See* Brown Dep. at 281:23–283:11. For another, the parties' joint facts stipulate that Brown was terminated because he failed to return to work from furlough. *See* JSOF ¶ 39 ("After Plaintiff failed to report to work, Learjet terminated his employment with the company."). And this lack of evidence is fatal to Brown's claim. But, even if Brown *could* make out a *prima facie* case of retaliation, his claim would still fail because, as we've explained, Learjet offers a legitimate, non-

discriminatory reason for Brown's termination: his refusal to return to work. And Brown never suggests that Learjet's reason was pre-textual.

We therefore **GRANT** the Defendant's Motion for Summary Judgment on Counts VII–IX.

\* \* \*

After careful review, then, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 57] is **GRANTED**.

2. Summary Judgment is **ENTERED** in favor of the Defendant, Learjet, Inc., and against the Plaintiff, Noel Brown, on all counts of the Amended Complaint [ECF No. 35].

3. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment separately.

4. This case shall remain **CLOSED**. All other deadlines are **TERMINATED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on December 24, 2025.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

43